CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2017 JAN -6  PM 12: 36

DEPUTY CLERK_____

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

MICHAEL JEROME ROLLISON,       )
                               )
          Plaintiff,           )
                               )
v.                             )      CIVIL ACTION NO.
                               )      5:15-CV-230-BQ
CAROLYN W. COLVIN,             )      ECF
Acting Commissioner of         )
Social Security,               )
                               )
          Defendant.           )

## REPORT AND RECOMMENDATION

Under 42 U.S.C. § 405(g), Plaintiff Michael Jerome Rollison seeks judicial review of a decision by the Commissioner of Social Security denying his applications for disability insurance benefits (DIB) and supplemental security income (SSI).  The United States District Judge transferred this case to the undersigned United States Magistrate Judge for further proceedings. Both parties did not consent to the jurisdiction of the Magistrate Judge.  In accordance with the order of transfer, the undersigned now files this Report and Recommendation.

### I. Statement of the Case

Rollison filed applications for DIB and SSI on May 11, 2011, alleging a disability onset date of April 24, 2011.  The Commissioner denied Rollison's initial claims, as well as his request for reconsideration.  Tr. 42.  Rollison then requested a hearing, which the administrative law judge (ALJ) conducted via videoconference on January 29, 2013. Tr. 40.  Rollison was represented by counsel at the hearing.  The ALJ determined on February 22, 2013, that Rollison was not disabled. Tr. 24.  The Appeals Council granted review of the ALJ's decision on August 21, 2013, and subsequently vacated it, remanding the case for resolution of several issues, namely: (1) a

1

determination about whether degenerative disc disease of the lumbar spine is a severe impairment under 20 C.F.R. §§ 404.1520(c) and 416.920(c); and (2) a more comprehensive discussion of Rollison's residual functional capacity (RFC) given his mental limitations.   Tr. 109–11. Thereafter, the ALJ held a second hearing on May 21, 2014, and issued another unfavorable decision on July 22, 2014. Tr. 21, 24. Rollison again requested review by the Appeals Council, which it denied on October 13, 2015. Tr. 1. Following denial of a request for review, the ALJ's decision becomes the Commissioner's final decision and is properly before the court for review. *Sims v. Apfel*, 530 U.S. 103, 107 (2000); *see Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005).

## II. Factual Background[1]

Rollison claims he became disabled on April 24, 2011, at the age of thirty-one. Tr. 66. He alleges his ability to work is greatly limited by the following impairments: depression; anxiety; post-traumatic stress disorder (PTSD); coronary artery disease; diabetes mellitus; sickle cell anemia; and degenerative joint disease of the lumbar spine and right hip. Tr. 25. He had quintuple bypass surgery in April 2011. Tr. 69–70. Rollison testified that he has a high school education and completed two years of college. Tr. 67. He has held various jobs, and he last worked as a cafeteria cook and a laundry worker at a nursing home. Tr. 25, 68. At the second hearing before

---

[1] The medical records, as well as the transcripts of the two hearings before the ALJ, contain conflicting information regarding Rollison's alleged physical limitations. *See, e.g.,* Tr. 47 ("I sit at home, watch TV."); Tr. 80 ("I'm not a TV watcher . . . ."); Tr. 54 (testifying that he uses a scooter in the grocery store because he cannot walk more than fifteen to twenty feet); Tr. 1671 (reporting that he exercises by walking around a track); Tr. 54 ("I can't lift anything because of my back pain."); Tr. 82 ("I don't lift anything over 5 to 10 pounds."); Tr. 563–64 (Rollison was examined in the emergency room after moving an iron bathtub.). For the purposes of this report and recommendation, the information provided in this factual background is limited to the testimony Rollison provided during the second hearing, dated May 21, 2014, before the ALJ. *See* Tr. 64–88.

the ALJ, Rollison testified that he stays at home, does some cleaning, cooks himself breakfast, and rests in bed or in a chair. Tr. 72–73, 79. He has three children living in his household, and his wife works as a certified nurse's aid at a nursing home. Tr. 67. Rollison claims he cannot perform any activities, has no interest in his hobbies, and cannot play with his children. Tr. 77, 80, 83. Rollison also alleges that he cannot drive a car. Tr. 73. His wife drives him to doctors' appointments and reminds him to take his medications throughout the day. Tr. 72–73.

### III. Standard of Review

A court reviewing the Commissioner's denial of disability insurance benefits is limited to determining whether (1) the decision is supported by substantial evidence in the record, and (2) the Commissioner applied the proper legal standards. *Higginbotham v. Barnhart*, 405 F.3d 332, 335 (5th Cir. 2005). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). Without reweighing the evidence or substituting its own judgment, a reviewing court must examine the entire record, including evidence favorable to the Commissioner as well as contrary evidence. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). If the Commissioner's findings are supported by substantial evidence, they are treated as conclusive and will be affirmed. 42 U.S.C. § 405(g) (2016); *Richardson v. Perales*, 402 U.S. 389, 390 (1971).

### IV. Discussion

Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (2016). In making a disability determination,

the Commissioner conducts a five-step sequential evaluation process to determine whether: (1) the claimant is currently working; (2) the claimant has a "severe impairment"; (3) the impairment meets or equals an impairment listed in Appendix 1 of the regulations; (4) the claimant is capable of performing past relevant work; and (5) the claimant, after taking into account age, education, previous work experience, and RFC, is capable of performing any other work. 20 C.F.R. § 404.1520(a)(4) (2016); *Audler v. Astrue*, 501 F.3d 446, 447–48 (5th Cir. 2007). If a disability determination is made at any step in the process, the finding is conclusive and the analysis terminates. *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). If a claimant is found to not be disabled at any step, however, the fact finder need not consider the remaining steps. 20 C.F.R. § 404.1520(a); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985).

At the first four steps in the analysis, the claimant bears the burden of proving his disability by establishing a physical or mental impairment. *Greenspan,* 38 F.3d at 236. Once this burden is satisfied, the Commissioner must demonstrate that the claimant is capable of performing other work that exists in significant numbers in the national economy. *Id.* After making such a showing, the burden shifts back to the claimant to rebut the Commissioner's finding. *See Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

In this case, the ALJ determined on remand that Rollison has not engaged in substantial gainful activity since the alleged disability onset date, though Rollison reported on at least two occasions in 2013 that he worked at a nursing home and owned a clothing store. Tr. 25. At step two of the sequential analysis, the ALJ found that Rollison's impairments of diabetes mellitus and sickle cell anemia are not severe, but his impairments of coronary artery disease, malignant hypertension, depression, and degenerative disc disease of the lumbar spine and the hip are severe. Tr. 25. At step three, the ALJ determined that Rollison did not have an impairment or combination

4

of impairments that met or medically equaled the severity of one of the listed impairments in Appendix 1. Tr. 26.

Following step three, the ALJ assessed whether, in spite of his severe impairments, Rollison retains the residual functional capacity (RFC) to perform his past relevant work. Tr. 26–27. The ALJ concluded that Rollison did not have the RFC to perform his past relevant work. Tr. 29. Rather, Rollison retains the RFC for light work limited by the need to sit or stand at his option; he cannot engage in climbing, crawling, kneeling or squatting; he can occasionally stoop or crouch; and he cannot have contact with the general public while in the performance of job duties. Tr. 29. The ALJ also concluded Rollison retains the RFC to understand, remember, and carry out simple instructions, make simple decisions, and attend and concentrate for extended periods. Tr. 29.

Finally, after considering testimony from a vocational expert (VE) as well as Rollison's age, education, work experience, and RFC, the ALJ concluded at step five that Rollison was not disabled. Tr. 30. In so doing, the ALJ noted that the Medical-Vocational Guidelines directed a finding of "not disabled" if Rollison retained the RFC for a full range of light work. Tr. 30. The ALJ considered Rollison's ability to perform light work to be "somewhat compromised." Tr. 30. Based on the testimony of the vocational expert, however, and the weight of the occupational information, the ALJ found that a person with Rollison's limitations could perform work that exists in significant numbers in the national economy, such as a bench assembler, a small products assembler, or a machine tender. Tr. 30.

Rollison presents two arguments on appeal. First, he argues that the ALJ failed to follow the remand order of the Appeals Council. Pl.'s Br., at 10–11. Second, he argues that the ALJ's decision at step three of the sequential analysis is not supported by substantial evidence. Pl.'s Br., at 14. Neither provides a basis for remand or reversal.

### A.     The ALJ followed the order of the Appeals Council on remand.

Rollison argues that the ALJ failed to follow the Appeals Council's order—which was issued on August 21, 2013 (*see* Tr. 108–11)—remanding the case to the ALJ for further consideration of several issues. Pl.'s Br., at 10. Rollison agrees the ALJ gave further consideration to his impairments of degenerative disc disease of the lumbar spine and hip at step two, in compliance with the Appeals Council's order. *Id.* at 11. He contends, however, that the ALJ did not follow the Appeals Council's order with respect to re-assessing his mental limitations, including the Appeals Council's directive that the ALJ reference specific evidence of record in support of the assessed limitations under 20 C.F.R. §§ 404.1545 and 416.945, and Social Security Rulings (SSR) 85-16 and 96-8p. *Id.*

Specifically, Rollison argues that the ALJ failed to take into consideration certain limitations the state agency psychologist Charles Lankford, Ph.D., included in a mental RFC assessment form. *Id.* at 11–13. Alternatively, even assuming the ALJ did take into consideration Dr. Lankford's findings, Rollison argues the ALJ failed to explain why certain mental limitations were not included in the RFC determination. *Id.* Rollison contends this error constitutes grounds for reversal because he might have prevailed if the ALJ had complied with the order of the Appeals Council. *Id.* at 13.

At the outset, the court notes that an ALJ's failure to comply with an Appeals Council order does not constitute reversible error. *Henderson v. Colvin*, 520 F. App'x 268, 273 (5th Cir. 2013). "Instead, the clear rule is that remand is warranted only where the ALJ's decision fails to apply the proper legal standard or the decision is not supported by substantial evidence." *Id.* Moreover, after the ALJ issued his second decision on July 22, 2014, following the Appeals Council's order at issue, Rollison again appealed to the Council, who in turn denied his request for review. Tr. 1–

4. The Appeals Council "found no reason under [its] rules to review the Administrative Law Judge's decision." Tr. 1. In other words, the Appeals Council did not find that the ALJ had failed to follow its previous remand order. *See* Tr. 1–4. Thus, Rollison's contention that the ALJ did not follow the Appeals Council remand order is without merit.

Nevertheless, after reviewing the order of the Appeals Council and the ALJ's second decision, the court concludes that the ALJ appropriately followed the order of the Appeals Council. The Appeals Council directed the ALJ to, among other things:

> Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and 416.945 and Social Security Ruling 85-16 and 96-9p). Include in the residual functional capacity, or explain why not, specific restrictions that correlate to the claimant's problems with concentration, persistence, or pace because the limitation to unskilled work or simple, routine tasks may not fully account for moderate limitations in concentration, persistence or pace.

Tr. 110. In accordance with the Appeals Council's remand order, the ALJ's second decision specifically discussed Rollison's RFC and restrictions related to his problems with "concentration, persistence, or pace." *See* Tr. 29. The ALJ relied on the report of Dr. Lankford, who evaluated Rollison's mental status through a psychiatric review technique (PRT), as set forth in 20 C.F.R. § 404.1520a, and a mental residual functional capacity (MRFC) assessment, which were both completed on May 31, 2012. *See* Tr. 1181–97. In the PRT, Dr. Lankford opined that Rollison has moderate limitations with respect to his activities of daily living and maintaining concentration, persistence, or pace. Tr. 1191. In the MRFC assessment, Dr. Lankford further opined that Rollison has moderate limitations in the following areas, listed by item number in Section I of the form:

A.3.   The ability to understand and remember detailed instructions.

B.5.   The ability to carry out detailed instructions.

B.6.   The ability to maintain attention and concentration for extended periods.

> B.11. The ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

Tr. 1195–96.

Rollison argues the ALJ failed to provide his reasoning for adopting some, but not all, of the mental limitations to which Dr. Lankford opined in Section I of the MRFC assessment. Pl.'s Br., at 12. Although the ALJ did not explicitly discuss his reasoning for including only some of the limitations in Section I of the MRFC assessment in Rollison's RFC, he was not required to do so. "[T]here is nothing in the commissioner's regulations or rulings that requires an ALJ to make findings concerning each of the limitations listed on [Section I] of the review forms utilized by the [state agency medical consultants] in assessing a claimant's mental residual functional capacity." *Huber v. Astrue*, No. 4:07-CV-477-A, 2008 WL 4694753, at *7 (N.D. Tex. Oct. 22, 2008) (citing 20 C.F.R. §§ 404.1513(c), 416.913(c); SSR 96-6p). Indeed, the Commissioner's Programs Operations Manual System (POMS) explains that Section I of the MRFC assessment form is "merely a worksheet to aid [the medical consultant] in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the RFC assessment." Soc. Sec. Admin., *Program Operations Manual System (POMS)*, DI 24510.060B.2 (Oct. 14, 2010), http://policy.ssa.gov/poms.nsf/lnx/0424510060. Instead, Section III of the MRFC assessment form "is for recording the mental RFC determination." *Id.* at DI 24510.060B.4. "It is in [Section III] that the actual mental RFC assessment is recorded, explaining the conclusions indicated in section I, in terms of the extent to which these mental capacities or functions could or could not be performed in work settings." *Id.* Therefore, the ALJ did not err by failing to include a specific discussion of the limitations to which Dr. Lankford opined in Section I. In fact, the ALJ

properly relied on Dr. Lankford's findings in Section III of the MRFC assessment in determining Rollison's RFC.

In Section III, Dr. Lankford opined that Rollison could "understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers, and supervisors, and respond appropriately to changes in routine work setting." Tr. 1197. The ALJ expressly adopted Dr. Lankford's MRFC assessment to the extent that he limited Rollison to light work requiring the "capacity to understand, remember and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, [and] accept instructions and respond appropriately to changes in routine work settings."[2] Tr. 29. The ALJ also found, as he is tasked with doing, that Rollison was more limited than Dr. Lankford opined with respect to Rollison's ability to interact adequately with co-workers and supervisors. Tr. 29; *see* 20 C.F.R. § 416.954(a)(3) (The RFC is "based on all of the relevant medical and other evidence" in the record.); *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985) ("The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."). The ALJ limited Rollison to jobs where Rollison has "no contact with the general public while in the performance of job duties and no more than superficial contact with co-workers and supervisors." *Id.*

---

[2] The ALJ's first decision, dated February 22, 2013, contains none of these additional limitations. *See* Tr. 100. In the first decision, the ALJ concluded that Rollison retained the RFC for light work "limited by the need to sit or stand, at that person's option, while in the performance of job duties, and further limited by no climbing, crawling, kneel or squat, and no more than occasional stooping and/or crouching; no contact with the general public while in the performance of job duties; and no more than superficial contact with co-workers and supervisors." Tr. 100. Following the order of the Appeals Council, the ALJ considered, and incorporated, mental limitations into Rollison's RFC in the second decision. Tr. 29–30.

In reaching his decision regarding Rollison's RFC, the ALJ noted that the medical records show that Rollison's complaints regarding his mental health were inconsistent. Tr. 28. The ALJ evaluated Rollison's testimony regarding all of his symptoms under SSR 96-7p,[3] and concluded that Rollison's testimony was not credible. Tr. 28. The ALJ noted that although Rollison reported significant mental health problems to Dr. Jewell, other evidence in the record indicated inconsistency or exaggeration in Rollison's portrayal of his symptoms. Tr. 28. The records demonstrate Rollison often denied experiencing *any* psychiatric symptoms. For example, during several examinations and emergency room visits, he denied experiencing any anxiety or depression, and physicians often noted that he was cooperative and had the appropriate mood and affect. *See* Tr. 727, 733, 798, 1073–76, 1130, 1228, 1255, 1596. Such evidence directly conflicts with the symptoms Rollison described to Dr. Jewell—namely, that he experienced "significant depression, sadness," crying more than usual, and feeling guilty most of the time. Tr. 1178. Yet even despite Dr. Jewell's opinion that Rollison's "psychiatric problems are significant," Dr. Jewell opined that with "psychiatric care, his problems should be manageable." Tr. 1179.

In sum, the ALJ evaluated the record as a whole, including the medical evidence and the limitations to which Dr. Lankford opined in Section III of the MRFC assessment, and made a determination of Rollison's RFC based on all of the evidence. The record in this case is extensive, and the ALJ is not obligated to perform "an exhaustive, point-by-point discussion" of the evidence. *See Audler*, 501 F.3d at 448. The court finds that the ALJ complied with the Appeals Council's order, and the ALJ's mental RFC finding is supported by substantial evidence; therefore, remand is not required.

---

[3] SSR 96-7p was superseded by SSR 16-3p on March 28, 2016; however, at the time of the ALJ's decision, SSR 96-7p was in effect. *See* S.S.R. 96-7p, 1996 WL 374186 (July 2, 1996).

**B. Substantial evidence supports the ALJ's step three determination.**

Rollison argues that the ALJ erred at step three of the sequential evaluation process by failing to specifically cite and discuss whether Rollison's chronic hip and back pain met or equaled the requirements of Listing 1.02 (major dysfunction of a joint) and Listing 1.04 (disorders of the spine) of the Listing of Impairments in Appendix 1. Pl.'s Br., at 14–17; *see* 20 C.F.R. pt. 404, subpt. P, app. 1. Rollison contends this was prejudicial error requiring reversal, or in the alternative, remand. Pl.'s Br., at 17.

The Social Security Administration considers the impairments included in the regulatory listings so severe that they automatically preclude the claimant from substantial gainful activity. *See Sullivan v. Zebley*, 493 U.S. 521, 531–32 (1990); *Henson v. Barnhart*, 373 F. Supp. 2d 674, 684 (E.D. Tex. 2005) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). Meeting an impairment in the listings serves as a "short-cut" for the claimant, and the impairment renders him *per se* disabled. *See Elam v. Barnhart*, 386 F. Supp. 2d 746, 755 (E.D. Tex. 2005) (citing *Albritton v. Sullivan*, 889 F.2d 640, 642 (5th Cir. 1989)). A claimant must establish that he satisfies *all* of the criteria in a listing, including any relevant criteria in the introductory sections, in order to qualify as disabled under that particular listing. 20 C.F.R. § 404.1525(c)(3). Diagnosis alone is not tantamount to disability; rather, "the set of symptoms, signs, and laboratory findings in the medical evidence supporting a claim must be compared with the set of symptoms, signs, and laboratory findings specified for the listed impairment most like the individual's impairment(s)." S.S.R. 83-19, 1983 WL 31248, at *2 (Jan. 1, 1983).

An ALJ's failure to specifically identify a listed impairment and explain why the claimant's alleged impairment does not meet the criteria of that listing may be reversible error. *Audler*, 501 F.3d at 448. Even when the ALJ fails to consider a listed impairment or explain why a listed

impairment does not apply, however, the claimant still bears the burden of proving that he meets the requirements of the listing. *Id.* at 449. Stated differently, an ALJ's failure to identify and explain why an impairment does not meet or equal a listing is reversible error only if the claimant can prove that he satisfies all of the specified criteria for that listing. *See Selders v. Sullivan*, 914 F.3d 614, 619 (5th Cir. 1990) (citing *Zebley*, 493 U.S. at 530).

In this case, the ALJ did not mention specific listing numbers in his decision. *See* Tr. 26–31. Rather, he simply concluded that after reviewing the record, Rollison "does not have impairments that meet or equal the requirements of any section of Appendix 1." Tr. 26; *see also* Tr. 31 (finding that Rollison "does not have an impairment or combination of impairments that are listed in, or that equal in severity an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1"). The ALJ also noted that "[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment." Tr. 26.

The ALJ's failure to identify certain listing numbers, and discuss how Rollison's impairments are insufficient to meet those listed impairments, does constitute error. *See Audler*, 501 F.3d at 448. Such error, however, only amounts to reversible error if Rollison establishes that his symptoms meet or equal the listings for which he claims he is impaired. *Id.* As discussed below, Rollison has failed to establish that his hip pain under Listing 1.02 or his back pain under Listing 1.04 meet all of the criteria for those respective listings.[4]

**1. Back pain under Listing 1.04A**

Listing 1.04 requires that a claimant establish a diagnosed spinal disorder, such as a "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc

---

[4] Rollison does not specify which subsections of Listings 1.02 and 1.04 he claims to meet or equal; however, the arguments in his brief seem to focus exclusively on Listings 1.02A and 1.04A. Thus, the court will limit its discussion to these sections.

disease, facet arthritis, vertebral fracture" that results "in compromise of a nerve root (including the cauda equine) or the spinal cord." 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04 (effective Feb. 26, 2014).[5]   In addition, a claimant must satisfy the criteria listed in subsection A, B, or C of Listing 1.04—i.e., the severity component.   Subsection A of Listing 1.04 requires sufficient evidence of the following: (1) "nerve root compression characterized by neuro-anatomic distribution of pain"; (2) "limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss"; and, (3) "if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04A.

Rollison contends that he meets all of the criteria to satisfy Listing 1.04A, arguing that "the record is replete with evidence of his chronic low back pain." Pl.'s Br., at 15–16.   Although Rollison is correct in that the medical records do show consistent and constant subjective complaints of back pain, Rollison has not established, and the objective medical findings in the record do not show, that he meets all of the criteria listed in subsection A of Listing 1.04.[6]

First, there is conflicting evidence in the record as to whether Rollison suffers from nerve root compression.   For example, on May 11, 2010, Rollison was examined in the emergency room for complaints of hip and lower back pain after moving an iron bathtub. Tr. 593–97. The results of an x-ray showed that he had a "normal lumbar spine," with "normal alignment," no fractures,

---

[5] There have been multiple revisions to and versions of the Listing of Impairments since the ALJ's hearings in this case on May 21, 2014.   The court's citations to the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, app. 1, are to the version effective from February 26, 2014, to December 8, 2014. *See Knotts v. Colvin*, No. 4:14-CV-692-A, 2015 WL 5547474, at *3 (N.D. Tex. Aug. 27, 2015) (holding that the Listing of Impairments in effect at the time of the ALJ's hearing apply to the ALJ's decision).

[6] The physical examination and findings for a claimant "must be determined on the basis of objective observation during the examination and not simply a report of the individual's allegation, e.g., 'He says his leg is weak, numb.'" 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00D.

and "no blastic or lytic bone lesions." Tr. 597. On February 25, 2012, the results of a magnetic resonance image (MRI) showed that "[t]he alignment of the lumbosacral spine is normal/No evidence for marrow replacement or marrow edema is seen. No evidence for discitis or vertebral osteomyelitis is noted." Tr. 1174–75. Additionally, three disc levels were "unremarkable" and three other disc levels showed the following diagnoses: (1) "mild bulging annulus" but "without significant compression effect," "[n]o evidence for central canal stenosis,"[7] and no evidence of "foraminal narrowing is noted on either side"[8]; (2) "[s]mall right foraminal disc protrusion," with "no significant compression effect . . ." and "almost complete obliteration of the right lateral recess and narrowing of the right neural foramen" and "left neural foramen is mildly narrowed"; and (3) "slight disc desiccation" with "[n]o evidence for compression effect" and "[n]o evidence for central canal stenosis" but "[b]oth neural foramina are narrowed." Tr. 1174–75. The MRI also revealed "[n]o significant facet disease" at the L3-4 level of Rollison's back, but it did show that at the L5-S1 level, he suffered from "[b]ilateral facet arthrosis."[9]

Similarly, an MRI conducted on October 16, 2012, revealed that although Rollison suffered from mild to severe neural foraminal stenosis at certain disc levels in his back, there was only

---

[7] Central canal stenosis is a narrowing of the central canal of the spine. *See* Stedman's Medical Dictionary 1650, 1673 (26th ed. 1995).

[8] Foraminal narrowing is a narrowing of the openings where spinal nerves leave the spinal column on either side of the spine. *See* U.S. Nat'l Lib. of Med., *Spinal Stenosis*, Medline Plus, https://medlineplus.gov/ency/article/000441.htm (last updated July 13, 2015).

[9] "The facets are the 'bony knobs' that meet between each vertebra to form the facet joints that join your vertebrae together." Univ. of Md. Med. Center, *A Patient's Guide to Anatomy & Function of the Spine*, http://umm.edu/programs/spine/health/guides/anatomy-and-function (last visited Dec. 29, 2016). Facet joint arthritis may develop over time and cause back pain, but "[n]umbness and tingling, the symptoms of nerve compression, are usually not felt because facet arthritis generally causes only *mechanical pain*." *Lumbar Facet Joint Arthritis*, http://www.houstonmethodist.org/orthopedics/where-does-it-hurt/lower-back/lumbar-facet-joint-arthritis (last visited Dec. 29, 2016) (emphasis in original).

"mild flattening of the exiting left L5 nerve," and at L4 to L5 there was "contact on but no neural impingement of the exiting left L4 nerve." Tr. 1252–53; *see Zimmerman v. Astrue*, 288 F. App'x 931, 937 (5th Cir. 2008) (affirming Commissioner's conclusion that plaintiff's impairment did not meet or equal Listing 1.04 where there was no direct indication of nerve root compression).

The ALJ also noted in his decision that on December 14, 2012, an x-ray of Rollison's thoracic spine showed that "12 thoracic vertebrae are normal in height," and there were "no paravertebral masses or lesions to the posterior elements." Tr. 1445. Likewise, a March 2013 visit to the emergency room revealed "no visible deformity" on his back, and his "neuro [was] completely intact." Tr. 1420. In sum, despite evidence of spinal and foraminal stenosis, there is no significant evidence that such stenosis has caused nerve root compression. *See, e.g.*, Tr. 1252–53.

Second, the record contains little evidence of neuro-anatomic distribution of pain—i.e., radiating pain caused by nerve compression. *See Chaplin v. Colvin*, 14-CV-935-Y-BL, 2016 WL 1715439, at *4 n.9 (N.D. Tex. March 17, 2016) (citing *Woods v. Colvin*, No. 3:14-CV-1990-B-BH, 2015 WL 5311142, at *13 (N.D. Tex. Aug. 26, 2015)) ("[N]euroanatomic distribution of pain 'entails pain radiating to the extremities[.]'"). Many of the records list Rollison's subjective complaints of radiating pain, but medical examinations did not reveal anything significant. *See, e.g.*, Tr. 563–64 (Rollison examined in the emergency room for complaints of hip and low back pain after moving an iron bathtub. Physician noted some right paraspinal muscle tenderness in his lower back, and he was diagnosed with a low back strain and treated with pain medication.); Tr. 1465–66 (Rollison examined in emergency room after a syncopal episode. Upon examination, physician noted that Rollison had "tenderness over the posterior thoracic and lumbar spine" but did not note anything else. The physician gave Rollison pain medication, and he left the emergency

room against medical advice.); Tr. 1479 (Rollison examined in emergency room for complaints of back pain. "No acute findings to account for the patient's pain otherwise."). *But see* Tr. 559–60 (Rollison examined in emergency room for complaints of right low back pain that radiates down to right hip. He denied "numbness, tingling, [or] weakness." An examination revealed "tenderness over the low back primarily on the right paraspinal muscles," and the physician diagnosed him with "acute low back pain with right leg radiculopathy."[10]); Tr. 1581 (Rollison examined in the emergency room for "lower back pain that radiates to r[ight] hip.").

Third, the records do not show that Rollison has experienced limited motion of the spine or motor loss accompanied by sensory or reflex loss. On April 5, 2011, Rollison was transported to the emergency room by ambulance after a car accident, complaining of right hip pain, right knee pain, and lower back pain. Tr. 688. Upon examination, the physician noted that Rollison had normal range of motion and alignment in his back, and "there [was] no fracture, subluxation or other acute post traumatic body abnormality of the cervical spine." Tr. 688–91. During an examination on May 11, 2010, Rollison had normal reflexes in his lower extremities (Tr. 564), an August 24, 2010, examination revealed that Rollison had "normal strength in the lower extremities" (Tr. 560), and an examination on May 23, 2012—to which Rollison cites in his brief—revealed that Rollison's "[u]pper and lower extremity motor strength is full throughout" and he "demonstrated at least brief 5/5 strength in all testable groups." Tr. 1172–73. Similarly, during a physical examination in August 2012, an emergency room physician noted that Rollison's back was nontender, had normal alignment, and had normal range of movement and strength. Tr. 1254–56. Likewise, during an October 2012 physical examination, Rollison scored 5/5 muscle strength on all but two of the exercises administered by the physician. Tr. 1238.

---

[10] Radiculopathy is a disorder of the spinal nerve roots. Stedman's Medical Dictionary 1484.

Finally, Rollison has not established, and the records do not show, that he consistently tested positive for straight leg raises in both the sitting and supine positions. For example, May 11 and August 24, 2010, examinations revealed negative straight-leg raise and normal patellar and Achilles tendon reflexes. Tr. 560, 564. An examination on May 23, 2012, revealed a positive straight leg raise at thirty degrees on Rollison's right leg (Tr. 1173); however, on October 10, 2012, Rollison did not experience any pain "while sitting and exten[ding] of right leg." Tr. 1299.

The single record to which Rollison directs this court in his brief—a May 23, 2012, medical examination—does not demonstrate that he meets *all* of the Listing 1.04A criteria. On the contrary, many of the findings in that medical record support the conclusion that Rollison does not meet all of the Listing 1.04A criteria. On May 23, 2012, Rollison was examined by Devin McCoy, P.A. Tr. 1172–73. At that visit, Rollison complained of back pain and right leg pain, which he claimed began six months prior. Tr. 1172. After conducting a physical exam and reviewing the results of the MRI taken February 25, 2012, Mr. McCoy diagnosed Rollison with lumbar degenerative disc disease and lumbar radiculopathy. Tr. 1173. Despite this diagnosis, Mr. McCoy did not note any motor loss accompanied by sensory or reflex loss, nor did he note any evidence of limitation of motion of the spine. Tr. 1173. Mr. McCoy noted a positive straight leg raise on Rollison's right leg. Tr. 1173. Rollison reported to Mr. McCoy that he "has noticed troubles with weak spells, but Mr. McCoy found through physical examination that Rollison's "[u]pper and lower extremity motor strength is full throughout" and he "demonstrated at least brief 5/5 strength in all testable groups." Tr. 1172–73. Mr. McCoy also found "he has no focal weakness that is ongoing in the right leg." Tr. 1172.

In sum, although the record indicates occasional findings of nerve compression, radiating pain, and positive straight leg raises, a few instances of favorable evidence do not establish that

Rollison meets the criteria of Listing 1.04A. *See* C.F.R., pt. 404, subpt. P, app. 1 § 1.00D

("Because abnormal physical findings may be intermittent, their presence over a period of time

must be established by a record of ongoing management and evaluation."). Indeed, the majority

of the record evidence repudiates Rollison's claim that he meets the Listing 1.04A criteria. *See*

*Zebley,* 439 U.S. at 530 (1990) ("For a claimant to show that his impairment matches a listing, it

must meet *all* of the specified medical criteria.") (emphasis in original). Overall, Rollison has not

met his burden of proving that he meets all the criteria for the disorders of the spine Listing 1.04A.

### 2.   Hip pain under Listing 1.02A

Section 1.02 defines "[m]ajor dysfunction of a joint(s) (due to any cause)." 20 C.F.R. pt.

404, subpt. P, app. 1, § 1.02. A major dysfunction is:

> Characterized by gross anatomical deformity (e.g. subluxation, contracture, bony
> or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of
> limitation of motion or other abnormal motion of the affected joint(s), and findings
> on appropriate medically acceptable imaging of joint space narrowing, bony
> destruction, or ankylosis of the affected joint(s).

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02.[11] Subsection A of Listing 1.02 requires that such

impairment(s) affect "one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting

in an inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. pt. 404, subpt. P, app. 1,

§ 1.02A. The "inability to ambulate effectively" is defined as "an extreme limitation of the ability

to walk; i.e., an impairment(s) that interferes seriously with the individual's ability to

independently initiate, sustain, or complete activities." *Id.* § 1.00B2b(1). The regulation also

provides examples of ineffective ambulation, including:

---

[11] Ankylosis is a "[s]tiffening or fixation of a joint as the result of a disease process, with fibrous
or bony union across the joint." Stedman's Medical Dictionary 93 (26th ed. 1995). Bony ankylosis
is an "[o]sseous union between the bones forming a joint." *Id.* at 1746. Fibrous ankylosis is a
"stiffening of a joint due to the presence of fibrous bands between and about the bones forming
the joint." *Id.* at 93.

> the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

*Id.* § 1.00B2b(2).

In support of his argument that he meets the requirements of Listing 1.02A, Rollison cites to two records: an April 15, 2013, health record (Tr. 1604–07), and a January 10, 2014, health record (Tr. 1579). On April 15, 2013, Rollison was examined in the emergency room after he fell when his right leg "gave out" while walking. Tr. 1604. An x-ray of his pelvis revealed that "[t]he joint spaces are well maintained," but that he suffers from "[s]evere DJD [degenerative joint disease] of both hips with large marginal hypertrophic spurs . . . ." Tr. 1607. Rollison was given pain medication, and his pain decreased and symptoms improved. *See* Tr. 1608.

On January 10, 2014, an MRI—to which the ALJ also cited in his decision (Tr. 27)—of Rollison's pelvis and hips revealed "poor off-set of the femoral head and neck junctions [that] *could* predispose to femoral acetabular impingement." Tr. 1579 (emphasis added). The physician noted that some images revealed conditions that are "likely degenerative in nature," "[m]ild, marginal spurring of the acetabula," and "probable small tear of the right superior labrum," but he did not note any space narrowing, bony destruction, or ankylosis. Tr. 1580.

Here, Rollison has not established, and the records do not show, that he is unable to ambulate effectively. The two records to which Rollison directs this court make no mention of an "extreme limitation of the ability to walk" nor do they mention that he cannot walk without the use of an assistive device such as a walker or cane.[12] *See* Tr. 1579, 1604–07.

---

[12] Rollison testified at the second hearing before the ALJ that he walks with a cane (Tr. 82), and there is at least one mention of his use of a cane in the medical records (Tr. 1690). The evidence does not indicate, however, that he is unable to walk without the use of two canes.

Furthermore, the ALJ cited to certain medical records in his decision indicating that Rollison is not so impaired as to limit his ability to ambulate. First, the ALJ noted that Rollison was examined in the emergency room on January 30, 2011, for right knee pain after a fall while skating. Tr. 29, 584. He was diagnosed with a sprain of the right knee and hip, and was prescribed pain medication. Tr. 585. The ALJ also cited to the examination notes and opinion of Amelia Jay, R.N., F.N.P.-B.C., who examined Rollison on May 5, 2014. Tr. 29. Ms. Jay noted that Rollison complained of "progressively worsening bilateral hip pain," but she did not make any findings regarding his inability to ambulate effectively. *See* Tr. 1687–93. Ms. Jay did write Rollison a note excusing him from work due to his medical conditions; however, the ALJ did not give her opinion controlling weight because her "evaluation of the claimant does not indicate that he was as limited as implied by Ms. Jay." Tr. 29, 1693.

There are numerous other notations in the record indicating that although Rollison suffers from hip pain, it does not amount to an extreme limitation on his ability to ambulate. For example, on October 24, 2012, he reported that he was exercising by walking five times per week. Tr. 1237. On January 21, 2013, he requested a prescription for portable oxygen because he was very out of breath "walking long distances for the past week." Tr. 1340. On July 22, 2013, Rollison likewise reported that he was "active and does a lot of walking." Tr. 1398. On March 21, 2014, at a clinic follow-up visit regarding hip pain, he reported that his hip bothered him "mostly when he is doing a lot of walking." Tr. 1671. He also reported that he was "exercising, doing some walking around a track." Tr. 1671. Furthermore, Rollison testified at the second hearing before the ALJ that he worked some in 2013 in a nursing home as a cook and in the laundry department, and he also reported that he owned a clothing store in 2013. Tr. 68, 1355, 1398.

Thus, even assuming Rollison has established that he suffers from a major dysfunction of the hip, he has not shown that such a dysfunction limits his ability to ambulate effectively. Rather, the records to which the ALJ cited, as well as additional evidence in the record, show that although Rollison suffers from hip pain, it does not seriously interfere with his "ability to independently initiate, sustain, or complete activities" such that he meets all of the requirements of Listing 1.02A. 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 1.00B2b(1), 1.02A.

In sum, Rollison has not met his burden of showing that his impairments meet or equal all of the criteria in Listings 1.02A or 1.04A. *See Zebley*, 493 U.S. at 531. Because Rollison did not establish that he meets all of the criteria in Listings 1.02A or 1.04A, "the ALJ had no reason to specifically consider and discuss" those listings. *Chaplin*, 2016 WL 1715439, at *5. In any event, Rollison was not prejudiced by any error the ALJ may have made at step three by failing to specifically cite Listings 1.02A and 1.04A because there is substantial evidence in the record to support the ALJ's conclusion that Rollison "does not have impairments that meet or equal the requirements of any section of Appendix 1." Tr. 26; *see Newton*, 209 F.3d at 452 (citing *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995)) ("If the Commissioner's findings are supported by substantial evidence, they must be affirmed."). Accordingly, the ALJ's failure to identify the listings and explain why Rollison did not meet the criteria for those respective listings in his step three analysis does not constitute reversible error.

## Recommendation

For the foregoing reasons, the undersigned recommends that the United States District Court affirm the Commissioner's decision and dismiss Rollison's Complaint with prejudice.

**Right to Object**

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2016); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Report and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: January 6, 2017

D. GORDON BRYANT, JR.
UNITED STATES MAGISTRATE JUDGE